## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**SHARON KAY LUCAS,**

     **Plaintiff,**

**vs.**                       **CIVIL ACTION NO. 2:16-CV-06047**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered July 7, 2016 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 10 and 13.)

The Plaintiff, Susan Kay Lucas (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on April 15, 2008, alleging disability since May 1, 2005 due to "residuals of back injury, osteoporosis, problems with ligaments in back, two transient ischemic attacks, short term memory loss, depression and stress". (Tr. at 188.) Her claim was denied on

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

August 27, 2008 (Tr. at 76-80.) and again upon reconsideration on November 18, 2008. (Tr. at 83-85.) Thereafter, Claimant filed a written request for hearing on November 18, 2008. (Tr. at 86-87.) On February 17, 2008, Claimant amended her alleged onset date to July 19, 2005 (Tr. at 153.), and on January 5, 2009, without holding an administrative hearing, Administrative Law Judge ("ALJ") David B. Daugherty found her disabled beginning on the amended alleged onset date. (Tr. at 60-69.)

By letter dated May 18, 2015, the Appeals Council advised Claimant that the Office of Inspector General found that there was reason to believe fraud was involved in certain cases involving evidence from specific doctors that was submitted to the agency by attorney Eric C. Conn and other representative associated with him, and because Mr. Conn's law firm represented Claimant, her case required a redetermination[2] without reference to the medical evidence submitted from the suspect doctors. (Tr. at 88-93.) On September 22, 2015, the Appeals Council reconsidered Claimant's case, and found that the prior ALJ's decision was not supported by a preponderance of the evidence, when the evidence from the suspect doctors was disregarded; her case was remanded to the Office of Disability Adjudications and Reviews for a new hearing and further determination. (Tr. at 71-75.)

An administrative hearing was held on January 7, 2015 before the Honorable Amy Benton. (Tr. at 31-57.) By decision dated March 24, 2016, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-30.) On April 20, 2016, Claimant sought review by the Appeals Council of the ALJ's unfavorable decision (Tr. at 6-7.) The ALJ's decision became the final

---

[2] Pursuant to 42 U.S.C. § 405(u), mandatory redetermination of a case only concerns the claim for benefits through the date of the ALJ's decision granting benefits; in this case, from July 19, 2005 through January 9, 2009, and only considers evidence relevant to whether the individual was disabled as of that date, including evidence that postdates the original allowance if it relates to the period at issue.

decision of the Commissioner on May 9, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On July 6, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful

activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked,

and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through September 30, 2009. (Tr. at 14, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity between the amended alleged onset date, July 19, 2005 and January 5, 2009, the date of the prior ALJ decision. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: status-post kyphoplasty at T8 and T12; peripheral neuropathy; cognitive disorder; and depression. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light work as defined in the Regulations

except she (1) could occasionally climb stairs and ramps; (2) could never climb ladders and scaffolds; (3) could occasionally balance, stoop, kneel, and crouch; (4) could never crawl; and (5) must have avoided concentrated exposure to industrial types of vibration, hazards such as unprotected heights and moving mechanical parts, and extreme heat and cold. Further, she could (1) understand, remember and carry out simple instructions; (2) only make simple, work-related decisions; and (3) only tolerate occasional change in work location. (Tr. at 18, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing her past relevant work. (Tr. at 23, Finding No. 6.) At the fifth step, the ALJ found that Claimant was 47 years old

on the amended alleged onset date, making her a younger individual; that she had at least a high school education and could communicate in English; that the transferability of job skills was immaterial to the determination of disability; and that Claimant's RFC, age, education and work experience through January 5, 2009, there were other jobs that existed in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 7-10.) On this basis, the ALJ determined Claimant was not under a disability from July 19, 2005 through January 5, 2009. (Tr. at 24, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

During the time period in question, from July 19, 2005 through January 5, 2009, Claimant was 47 years old on the amended alleged onset date, defined as a "younger person" by the Regulations, and then transitioned to an individual "closely approaching advanced age" by the date of the prior ALJ's decision. See 20 C.F.R. § 404.1563(c) and (d). Claimant graduated high school and subsequently attended college for one semester, but did not obtain a certificate or degree. (Tr. at 41.) Claimant worked part-time as a sales clerk at a jewelry store from November 2007 through December 2007. (Tr. at 41, 189.)

Issues on Appeal

Claimant has alleged two[4] main grounds in support of her appeal: (1) that the ALJ erred by failing to account for Claimant's moderate difficulties in concentration, persistence, or pace in her hypothetical question and in her RFC finding; and (2) that the ALJ did not apply the correct legal standard when evaluating Claimant's credibility regarding her limitations. (Document No. 10 at 7.)

The Relevant Evidence of Record[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records Pertaining to Physical Impairments:

In May 2005, Claimant presented to Lenore Medical Clinic and reported back pain after lifting a heavy item. (Tr. at 279.) The provider diagnosed an acute lumbar spine strain and

---

[4] Claimant had previously alleged an additional ground in support of her appeal, however, she withdrew her argument conceding that the ALJ's hypothetical question included the same limitations as those contained in her RFC finding. (Document No. 14 at 2.) Accordingly, the undersigned will only address those issues on appeal that remain contested.
[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

8

recommended rest, cold compresses, Skelaxin, and Naprosyn. (Id.) In June 2005, diagnostic tests showed a compression fracture likely at T8. (Tr. at 482.) Later that month, Claimant underwent a T8 and T12 kyphoplasty.[6] (Tr. at 466-467.)

She returned to the Lenore Medical Clinic in May 2006 with complaints of severe pain in her lower legs, knees, and hips. (Tr. at 287.) On examination, Claimant had tender sacroiliac joints (Id.); X-rays revealed no fracture or other significant abnormality. (Tr. at 288, 290.)

In June 2006, Claimant presented to the emergency room with mid-back pain radiating to her neck after lifting heavy furniture the day before. (Tr. at 471-472.) The attending physician's examination showed normal 5/5 strength and intact sensation throughout, and diagnostic tests showed a normal cervical and lumbar spine. (Tr. at 294, 298, 471.) A follow-up examination at Lenore Medical Clinic showed tenderness and spasms. (Tr. at 293.)

Claimant met with neurologist Joby Joseph, M.D. in September 2007 with complaints of headaches, dizziness, left arm numbness, and forgetfulness. (Tr. at 270-271.) Her current medications included Lisinopril and Effexor. (Tr. at 271.) Dr. Joseph's examination showed that Claimant was alert and oriented times three, and had clear speech; good strength; intact sensation; and a normal gait and station. (Id.) He prescribed headache medication, and ordered an MRI of her brain that was unremarkable. (Tr. at 269, 271.) During a November 2007 follow-up appointment, Claimant still had headaches and some dizziness, but an unremarkable physical examination. (Tr. at 268.) Dr. Joseph recommended weaning off Effexor and starting Lexapro for her depression and anxiety. (Id.) He also recommended Phrenelin Forte for headaches. (Id.)

---

[6] The Commissioner has explained "[a] kyphoplasty is a minimally invasive procedure in which a doctor injects a cement mixture into a fractured bone to stabilize it. See http://www.healthline.com/health/bone-health/kyphoplasty#Overview1 (last visited Nov. 22, 2016)." (Document No. 13 at 5, fn.5.)

Claimant saw Anbu Nadar, M.D., in February 2008 for an evaluation of her back pain. (Tr. at 322.) On physical examination, Claimant had a straight spine with tenderness in the lumbar paravertebral muscles but no spasms; limited range of motion; a negative straight leg-raising test; intact reflexes; and no sensory or motor deficits. (Id.) In addition, Claimant could ambulate independently. (Id.) Dr. Nadar prescribed Lortab and referred her for a body scan. (Id.) When Claimant returned three weeks later, she still reported persistent back pain with some radiation down her leg. (Tr. at 323.) Dr. Nadar reviewed the bone scan, noting it showed a mild uptake over the thoracic region. (Id.) Claimant was still tender over the cervical and lumbar muscles and had difficulty walking. (Id.) Dr. Nadar encouraged heat and rest, and prescribed Ultram. (Id.) He also administered a steroid injection that provided Claimant with some relief. (Id.)

In March 2008, Claimant was treated at the hospital for left-side face numbness. (Tr. at 267, 439.) The MRI and CT scans of Claimant's head were unremarkable, and the physical examination showed full range of motion and a normal gait and station. (Tr. at 439-440.) When discharged, she had only mild residual numbness on the left side of her face and her blood pressure was controlled (Tr. at 441.) Claimant's anxiety, headaches, and back pain were stable as well. (Tr. at 442.) The hospital recommended that she follow up with her neurologist and continue her medications. (Tr. at 441.)

In June 2008, Claimant started treatment at Holistic Medical Family Practice because she needed a primary care physician. (Tr. at 422.) The physical examination was unremarkable other than cervical and lumbar pain and a depressed and anxious mood. (Tr. at 421.) The nurse practitioner diagnosed chronic pain syndrome. (Id.) The follow-up examinations were generally normal other than reflecting some limited range of motion in Claimant's spine. (Tr. at 408-420,

1134-1170.)

Claimant also sought treatment from a podiatrist during the relevant period. (Tr. at 362-406.) On May 22, 2007, Claimant called Kenneth Avery, DPM, and complained of increased pain in her calves and feet since she had been helping with yard work recently. (Tr. at 364.) In August 2007, Claimant reported that orthotics were helpful, but that she preferred to wear sandals during the warmer weather. (Tr. at 393.) The physical examinations showed mild edema at Claimant's heels and mild to moderate pain, but also consistently showed intact sensation in both feet, and 5/5 muscle strength in all muscle groups. (Tr. at 361-366, 387-398.) Mr. Avery recommended that Claimant not walk in her bare feet and that she wear running sneakers with orthotics; he also prescribed medications that helped, and administered an injection that was "very helpful". (Tr. at 387-398.)

At the state agency's request, Jules Barefoot, M.D., performed a consultative internal medicine examination in July 2008. (Tr. at 326-331.) Claimant reported a history of thoracic spine compression fractures requiring fusion, and a history of a transient ischemic attack with slurred speech and left facial numbness, both of which had resolved. (Tr. at 328.) At the time of the examination, Claimant's blood pressure was well-controlled. (Id.) Dr. Barefoot's physical examination showed diminished lumbar forward flexion, but full cervical spine, shoulder, elbow, wrist, hip, knee, and ankle range of motion; no extremity clubbing, cyanosis, or edema; no muscle asymmetry; no joint edema, redness, or warmth; no focal motor or sensory deficits; good grip strength bilaterally; no gross or fine manipulation deficits; 5/5 muscle strength in her upper and lower extremities; a normal gait; the ability to walk without using an assistive device; and the ability to squat, but with complaints of pain. (Tr. at 328-331.)

In August 2008, state agency physician A. Rafael Gomez, M.D., reviewed the record evidence and concluded Claimant could perform light work with various postural and environmental limitations despite her impairments. (Tr. at 341-345.) At the reconsideration level of review, Marcel Lambrechts, M.D., affirmed Dr. Gomez's opinion in part, but modified the postural and environmental limitations by adding restrictions against balancing and concentrated exposure to extreme cold and heat. (Tr. at 424-427.)

<u>Evidence Relating to Mental Impairments:</u>

Claimant did not seek or receive any specialized mental health treatment during the relevant period. She saw her primary care physician in March 2007 for complaints of depression following a bereavement. (Tr. at 304.) The provider at Lenore Medical Clinic prescribed Wellbutrin, Zoloft, and Ambien. (Tr. at 303-304.) In April 2007, a nurse prescribed Paxil. (Tr. at 303.) By May 2007, Claimant reported that she was not able to tolerate Zoloft, and that she was not taking her medications regularly as prescribed; it was noted that she was unable to sleep without using medication. (Tr. at 307.) By June 2007, Claimant reported having difficulties falling asleep and having no energy during the day, she was no longer taking Paxil, and was prescribed Trazadone. (Tr. at 305.) During an October 2007 appointment, Claimant continued to report sleep difficulties, but was considering returning to work. (Tr. at 316.) The provider prescribed Effexor and Ambien. (<u>Id</u>.)

During an April 2008 appointment at Lenore Medical Clinic, Claimant stated she could not take and tolerate Effexor. (Tr. at 320.) The provider substituted Prozac and Vistaril. (<u>Id</u>.) The provider also referred Claimant for a psychological evaluation and counseling; the record does not reflect that Claimant followed up with the referral. (<u>Id</u>.)

On August 6, 2008, DDS examiner Lester Sargent, M.A., performed a consultative psychological evaluation. (Tr. at 332-338.) Mr. Sargent observed that Claimant had a straight posture and a normal gait. (Tr. at 332.) During the evaluation, Claimant focused on her pain and reported a depressed mood and impairment in cognitive functioning due to a history of mini strokes. (Tr. at 333.) She had been taking medication for depression since the death of her sisters in 2006 and 2007. (Id.) She reported having completed the 12th grade in regular education classes, and completed one semester of college. (Tr. at 334.) She also maintains a valid driver's license (Id.) Claimant could perform all basic self-care activities and household chores without assistance, but noted limitations due to pain. (Tr. at 337.) She attended church regularly, and kept in touch with several friends. (Id.) Claimant enjoyed dining out with her husband, liked to take walks after dinner, and visited friends and family members. (Id.) She watched television and played with her dog during the day, and cleaned her house as needed. (Id.)

Mr. Sargent's mental status examination showed a sad mood and mild anxiety with a mildly restricted affect, but her thought processes were understandable and connected, there was no evidence of unusual perceptual experiences, and her judgment and insight were normal. (Tr. at 336.) Claimant's concentration was mildly deficient, her persistence was normal based on her ability to remain on task, and her pace was normal to mildly slow. (Id.) On the Wechsler Adult Intelligence Scale – Third Edition, Claimant obtained a full-scale IQ sore of 82. (Tr. at 334.) During testing, she sat comfortably without apparent distress and minimal restless behaviors. (Tr. at 334-335.) She worked at a normal to mildly slow pace, did not need directions repeated, attempted every task presented, and maintained reasonable persistence throughout the evaluation. (Tr. at 335.) Mr. Sargent diagnosed a pain disorder associated with both psychological factors and

a general medical condition; major depressive disorder, single episode, moderate; and a cognitive disorder not otherwise specified. (Tr. at 336-337.)

Later that month, on August 25, 2008, state agency psychologist Timothy Saar, Ph.D., reviewed the record evidence and concluded that Claimant's pain disorder, cognitive disorder, and major depressive disorder resulted in mild limitations in daily activities, maintaining social functioning, and maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 348-349, 351, 354, 358.) Dr. Saar concluded that Claimant did not have a severe mental impairment. (Tr. at 348.)

Function Report – Adult

On April 28, 2008, Claimant completed a Function Report and indicated that on a typical day, she did light household chores such as cooking, dusting, and washing dishes. (Tr. at 201-203.) She reported taking care of her puppy by taking it outside to use bathroom on a daily basis. (Tr. at 202, 204.) Also on a daily basis, she would watch television, play with her dog, and talk on the phone with her family; she attended church once a week. (Tr. at 205.)

The Administrative Hearing

Claimant Testimony:

During the time period at issue, from July 19, 2005 to January 5, 2009, Claimant testified that she did not receive worker's compensation or unemployment benefits. (Tr. at 40.) She stated that she did have a driver's license and she was able to drive about five to seven minutes from her home, but could not drive further due to pain in her back. (Id.) Claimant testified that she could only work part-time as a sales clerk at a jewelry store, between fifteen to twenty hours a week, or three to four hours a day several days a week, because her back and feet caused her pain and she

14

even left early some days if business was slow. (Tr. at 41-42.) She stated that if she stayed at work and was not busy, she was allowed to sit on a stool. (Tr. at 48.) Claimant testified that other work she had performed in the past had included being a cashier at a furniture store for three or four years. (Tr. at 42.)

Claimant testified that pain in her back and legs prevented her from working full-time during the period under consideration, and she was seeing several doctors during that time and was taking several medications including blood pressure medication, medication for depression, Neurontin, Celebrex, and Lyrica. (Tr. at 43.) She stated that she thought her depression medication was prescribed by her general practitioner. (Tr. at 43-44.) She stated that she thought she saw a psychiatrist once or twice in 2008 or 2009, but she could not remember the doctor's name. (Tr. at 44-45.)

Claimant testified that, during the time frame under review, that if she worked three or four hours she would go home and lie down and put heat or ice on her back and prop her feet up because they hurt so much. (Tr. at 45.) She and her husband lived alone. (Id.) She stated that she did housework if she felt like it, but if she did not feel like it, her husband did the housework. (Id.) She stated that if she did housework it was light cooking or light cleaning and her husband did all the heavy cleaning. (Id.) She testified that she could not sweep, mop, or vacuum the floors because it hurt her back, but she did dust, did do dishes if there were not too many, and did do light cooking. (Tr. at 46.) She stated that she did not have any hobbies and if she were home she would sit and watch television. (Id.) She stated that she went out to places if it was a necessity, but she was so depressed she did not care if she went out. (Id.) She stated that she did have a small house dog that was housebroken and she took care of it. (Id.)

Claimant testified that when she did light housework or cooking, she could only be on her feet about five or ten minutes before she had to sit and rest. (Tr. at 47.) She stated she would sit for fifteen to twenty minutes or longer, with heat or ice on her back before she got back up. (Id.) She stated that she could not have worked for three or four hours and then gone home and done one of her household chores because she had too much pain in her back, legs and feet. (Tr. at 48.) Claimant acknowledged that she had tried trigger point injections in her back, in an effort to relieve the pain, and she had participated in physical therapy, however, neither the injections nor the physical therapy relieved her pain. (Tr. at 47.) She stated that she also underwent cementing of the discs in her back. (Tr. at 49.) Claimant testified that she had surgeries on her feet prior to her alleged onset date, but from 2005 through 2009 she had constant pain in her feet; she stated she still had pain in her feet on the date of the hearing. (Tr. at 48.)

Claimant stated she could sit for about five to ten minutes before needing to get up to walk around or lie down. (Tr. at 48-49.) She stated that after sitting at the hearing for twenty-five minutes she had "real bad" pain in her back, and when she went home that day she would be laying with a heating pad. (Tr. at 49.) Claimant testified that during the time period at issue the pain in her back "was so excruciating I just couldn't hardly stand it". (Id.)

Katherine R. Bradford, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's past work as a sales clerk was classified as light, semi-skilled and sedentary, semi-skilled work. (Tr. at 52.) The ALJ asked the VE to assume an individual of the same age, education, and work history as Claimant, who was capable of performing light exertional work, but who could only occasionally climb stairs and ramps, never climb ladders or scaffolds, and who needed to avoid concentrated exposure to industrial types of

vibration and hazards such as unprotected heights and moving mechanical parts, extreme heat and extreme cold. (Tr. at 52-53.) The ALJ then asked the VE whether the described individual could perform Claimant's past work and the VE testified that the individual could perform both past sales clerk positions. (Tr. at 53.)

The ALJ then asked the VE to assume all of the limitations in her first hypothetical but to also assume that the person was limited to understanding, remembering and carrying out simple instructions and could only tolerate occasional change in work locations. (Id.) The VE testified that with the additional restrictions, the individual could not perform Claimant's past work; however, the individual could perform other jobs that existed in the regional or national economy and gave as examples the light unskilled jobs of assembler, inspector, and packager. (Tr. at 53-54.)

The VE testified that if the individual described in the first two hypotheticals was instead limited to sedentary exertional work, the individual could perform jobs at the unskilled level such as general production worker, inspector/tester, or assembler. (Tr. at 54-55.) The VE testified that if the individual in ALJ's third hypothetical needed to take breaks in addition to their regularly scheduled breaks in order to sit down and rest approximately twice a day for twenty minutes each time, the individual would be unable to maintain any competitive unskilled employment. (Tr. at 55.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

First, Claimant argues that the ALJ's failure to account for her moderate limitations in concentration, persistence, or pace in either the hypotheticals provided to the VE or explain why it was unnecessary to include these limitations in the RFC is similar to the reversible error found

17

in <u>Mascio v. Colvin</u>, 780 F.3d 632, 637-638 (4th Cir. 2015). (Document No. 10 at 10.) Since the ALJ did not provide these limitations in the hypothetical questions, the VE's responses are unreliable because the Court cannot ascertain that Claimant can actually perform the jobs she cited, therefore, remand is necessary. (<u>Id</u>. at 11.) Next, Claimant contends that the ALJ deviated from the Regulations and case law in her analysis of Claimant's allegations of pain and of her credibility. (<u>Id</u>. at 13.) The ALJ only focused on the medical records that disproved Claimant's allegations of pain, thus finding her incredible, but failed to consider all the factors enumerated under 20 C.F.R. § 404.1529(c) and SSR 96-7p. (<u>Id</u>. at 14-15.) Claimant points out that the ALJ did not acknowledge the consultative psychologist's opinion at all, thus underscoring the ALJ's faulty analysis insofar as it failed to consider all the evidence of record. (<u>Id</u>. at 15-16.)

The Commissioner responds that the ALJ properly performed the special technique as required under the Regulations with respect to Claimant's mental impairments, and referenced the evidence regarding Claimant's moderate difficulties in concentration, persistence, or pace, and then translated that evidence into her findings into an appropriate RFC assessment upon which the VE opined that Claimant could still perform other work despite her limitations. (Document No. 13 at 12-14.) Next, the Commissioner maintains that the ALJ also properly analyzed Claimant's credibility with respect to her subjective complaints under the Regulations' mandated two-step process, which included the objective medical evidence of record as well as Claimant's allegations of disabling symptoms. (<u>Id</u>. at 15-17.) The Commissioner concludes that the ALJ properly terminated Claimant's benefits due to insufficient evidence supporting a finding of disability. (<u>Id</u>. at 18.)

Claimant replies that the ALJ did not expressly explain how Claimant's moderate

limitations in her concentration, persistence, or pace, translated into her RFC finding; without any explanation, <u>Mascio</u> necessitates remand. (Document No. 14 at 1-2.) Further, Claimant maintains that the Commissioner failed to abide by her own Regulations, as well as Fourth Circuit case law with regard to her credibility analysis, therefore the decision is unsupported by substantial evidence. (<u>Id</u>. at 3.)

Analysis

<u>Functional Limitations and RFC Findings:</u>

At steps four and five of the sequential analysis, the Regulations mandate that an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id</u>. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. <u>See</u> 20 C.F.R. § 404.1546.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That

is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a *per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

With regard to Claimant's moderate difficulties in concentration, persistence, or pace, the ALJ stated:

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. In her function report, the beneficiary reported difficulties with her memory, completing tasks, concentrating, understanding and following directions (Exhibit 4E). However, she also reported

20

that she was able to care for a pet, shop in stores, and prepare meals. These activities suggest an ability to maintain concentration, persistence, and pace. At the consultative examination, the beneficiary was able to sit throughout the evaluation (Exhibit 5F). She worked at a normal-to-mildly-slow pace (*id.*, p. 4). Her immediate memory was within normal limits, recent memory was moderately deficient, and remote memory was normal (*id.*). Her concentration was mildly deficient based on a digit span score of seven (*id.*). In sum, the medical evidence of record shows no major abnormalities in the beneficiary's ability to maintain concentration, persistence or pace. Thus, the record shows the beneficiary had no more than moderate restrictions with regard to concentration, persistence or pace. (Tr. at 17.)

The ALJ then identified this "paragraph B" limitation not as RFC, but used to rate the severity of the mental impairments. (Tr. at 18.) Next, the ALJ performed the two-step process required to assess Claimant's symptoms with the objective medical evidence, and found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. at 18-19.) However, in determining Claimant's RFC and "maximum capacity for work on a sustained basis", the ALJ found Claimant "partially credible as she is subject to a degree of functional restriction as a result of her various impairments, both physical and mental." (Tr. at 19.) The ALJ noted that the medical record did not show Claimant had specialized mental health treatment, but received treatment from her primary care provider. (Tr. at 21.) The ALJ outlined Claimant's treatment for her mental impairments as well as the results of the consultative psychological examination by Mr. Sargent, described *supra*. (Id.) Finally, the ALJ's RFC assessment accommodated Claimant's mental impairments, specifically, her moderate difficulties in concentration, persistence, or pace was by restricting her to a work environment where "she could understand, remember and carry out simple instructions; only make simple, work-related decisions; and only tolerate occasional change in work location." (Tr. at 18.)

Claimant relies on Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) in support of her argument that the ALJ herein failed to include her moderate difficulties in concentration,

persistence or pace in her hypothetical posed to the VE or explain why the omission was unnecessary. In <u>Mascio</u>, the Fourth Circuit held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." <u>Id</u>. (quoting <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Court explained that "the ability to perform simple tasks differs from an ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." <u>Id</u>. If an ALJ finds that the concentration, persistence, or pace limitation does not affect a claimant's ability to work, then it would be appropriate to exclude it from the hypothetical. <u>Id</u>. In this case, the ALJ provided the following explanation for her RFC determination:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence, the opinions of record, and the beneficiary's hearing testimony. I find the beneficiary's allegations are not fully credible. . . . In terms of the beneficiary's mental impairments, the record shows conservative treatment and there is no evidence of psychiatric hospitalizations during the relevant period. The record does show evidence of lower cognitive functioning, but not to the extent alleged. The consultative examinations showed the beneficiary's memory was within normal limits with some deficiency in recent memory (Exhibit 5F). She was able to complete the testing with a mildly slow pace (*id*.). The record also shows that the beneficiary was able to complete activities of daily living, care for her pet, attend church, shop in stores, and drive. The beneficiary's ability to engage in these activities suggest her cognitive impairment was not as limiting as alleged. In terms of beneficiary's credibility, a few inconsistencies are noteworthy. . . . the beneficiary alleges in an ability [*sic*] to perform work activity due to back and foot pain, but the record shows that she was lifting furniture in June 2006 – nearly a year after her back surgery (Exhibit 13F). This action is inconsistent with her allegation she is unable to perform work activity due to her symptoms. For the reasons stated, I find the beneficiary has the ability to perform the residual functional capacity outlined above. (Tr. at 22-23.)

The aforementioned not only addressed the evidence used to support the ALJ's finding that Claimant's concentration, persistence, or pace had moderate limitations, but also that the evidence

further supported that despite this limitation, Claimant was not so impaired that it adversely affected her ability to *remain on task*, pursuant to <u>Mascio</u>. In short, the above recitation adequately explains why Claimant's moderate difficulties in concentration, persistence or pace were not included in the hypotheticals posed to the VE, therefore, the ALJ's exclusion is supported by substantial evidence. <u>See</u>, <u>e.g.</u>, <u>Fairall v. Colvin</u>, 1:15-cv-234, 2016 WL 6833423, at *5 (N.D.W. Va. Aug. 18, 2016), *report and recommendation adopted*, 1:15-cv-234, 2016 WL 6834002 (N.D.W. Va. Nov. 18, 2016).

<u>Credibility and Pain:</u>

Social Security Ruling 96-7p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. <u>See</u>, <u>also</u>, <u>Hammond v. Heckler</u>, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and

---

[7] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on March 24, 2016. <u>See</u>, SSR 16-3p, 2016 WL 1131509.

from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Claimant argues that the ALJ relied almost exclusively on the objective medical evidence to find her allegations of pain less credible, when the Regulations, *supra*, clearly dictate that "all of the evidence in the case record" must be considered. However, a review of the ALJ's decision shows that she indeed considered other relevant evidence regarding the intensity and persistence of Claimant's symptoms: (1) Claimant testified that on a "typical day, she was able to do light household chores such as cooking, dusting and washing dishes. She would generally sit and watch television. She would go to Wal-Mart as needed. She was able to take care of a pet dog" (Tr. at 19, 45-46.); (2) Claimant "was able to complete activities of daily living, care for her pet, attend church, shop in stores, and drive" (Tr. at 22, 40, 45-46, 201-203, 205, 337.); Claimant alleged in her function report she did no yard work (Tr. at 23, 204.), but in May 2007, Claimant complained of leg pain after helping do yard work (Tr. at 23, 364.)[8]; and Claimant alleged she was unable to work during the relevant time period because of back and foot pain, but in June 2006, she lifted heavy furniture, nearly a year after having back surgery. (Tr. at 23, 471-472.)

However, what queers this credibility analysis are the two instances of "inconsistencies" the ALJ found regarding Claimant's credibility, *supra*: (1) the ALJ's comparison of Claimant's function report from 2008 and the notation in a medical record from nearly a year earlier; and (2) the ALJ's noting that Claimant had been "lifting furniture in June 2006 – nearly a year after her

---

[8] The undersigned notes that Claimant's function report is dated April 28, 2008 – nearly a year after she called Mr. Avery complaining of leg pain after helping do yard work.

back surgery". (Tr. at 23).[9] The record shows that Claimant had also worked part time at a jewelry store from November 2007 through December 2007. (Tr. at 189.) These are not factual "inconsistencies" – the questionnaire, dated April 28, 2008, specifically asked: "If you don't do house or yard work, explain why not." The Claimant's response was: "no outside/yard work". The question did not ask if Claimant had *ever* done yard work, but asked if she did not *currently* do yard work then state the reasons. Read in its context, the Claimant's answer indicates that she does not currently do yard work which is not inconsistent with her statement in May of 2007 that she "has been helping do yard work recently and her foot and leg pain has increased." (Tr. at 364.) Further, Claimant's alleged assistance in lifting furniture while doing household chores a year after back surgery is not "inconsistent" when the record is replete with the Claimant's own admission that she attempted to do household chores and cleaning and that she attempted to return to work, at least part time in late 2007. (Tr. at 189.) The ALJ's citing these two instances supporting her conclusion that Claimant is less than credible is a mere paralogism, illustrating that the credibility analysis is flawed, thus necessitating remand.

Duty to Weigh the Evidence:

Within Claimant's argument that the ALJ's credibility finding was flawed is the fact that the ALJ did not consider one of Mr. Sargent's diagnoses, specifically, "Pain Disorder Associated with both Psychological Factors and a General Medical Condition".[10] (Document No. 10 at 15; Tr. at 336.) Mr. Sargent gave Claimant this diagnosis because:

> both psychological factors and a generalized medical condition are judged to play
> important roles with the onset, severity and exacerbation of the claimant's pain

---

[9] The ALJ referenced Exhibit 13F, pp. 34-35 that noted two entries regarding this matter, namely: "Lifting and cleaning furniture…" and "…onset yesterday cleaning and lifting heavy furniture".
[10] The ALJ only acknowledged Mr. Sargent's other two diagnoses: "major depressive disorder and cognitive disorder". (Tr. at 21, 337.)

complaints. She is reporting significant distress in social, occupational and other areas of functioning secondary to chronic pain, and she appears sad and frustrated with her inability to work and perform other activities at the pre-illness level. (Tr. at 335.)

Moreover, Claimant points out the fact that the ALJ failed to assign a weight to Mr. Sargent's opinion in violation of her duties under the Regulations. Indeed, 20 C.F.R. § 404.1527(c) provides that "[r]egardless of its source, we *will* evaluate every medical opinion we receive." (emphasis added) Interestingly, nowhere in the decision did the ALJ acknowledge Dr. Timothy Saar's Psychiatric Review Technique, a DDS psychological consultant (Tr. at 348-361.), and the only psychological opinion evidence for the relevant time period was provided by Mr. Sargent and Dr. Saar.

The Fourth Circuit has provided guidance with respect to an ALJ's failure to expressly assign weight to certain evidence of record: "We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-236 (4th Cir. 1984) (citing Myers v. Califano, 611 F.2d, 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)).

The absence of any weight assigned to the opinion evidence, coupled with the flawed credibility analysis, requires the ALJ's decision to be reversed and remanded for further proceedings to correct the mistakes discussed *supra*. To clarify, the Court is unable to provide meaningful review for the ALJ's flawed credibility analysis and failure to assign any weight to the only *psychological* opinion evidence of record when the ALJ expressly discredited Claimant's allegations solely on the basis of her *physical* impairments. Accordingly, the decision to terminate Claimant's benefits is not based on substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 10.), to the extent that Claimant requests remand of this matter, **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to make a proper credibility analysis and appropriate weighing of the opinion evidence as required under the Regulations.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d

91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

      The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

      ENTER: February 7, 2017.

Omar J. Aboulhosn
United States Magistrate Judge